My name is Bill Reisner, and I represent the appellant and the family of Penacho Rodriguez. The fulcrum of the lower court's decision was that the written policy of the INS said staff will act to prevent suicides with appropriate sensitivity, supervision, and referrals. Any clinically suicidal detainee will receive preventive supervision and treatment. The judge interpreted that as clearly, he said, left the decision as to how and in what manner to be discretionary. And I think the judge was plainly wrong on that. This court, it's a de novo review, de novo examination of it. If we'd look at, for instance, the Berkovitz case, the court held that where a government agency, they had no discretion to violate specific directives in that case, which was to test the immunization medicine that was to be given. Mr. Reisner, if the Immigration Service believes that Castillo had suicidal tendencies, they had to keep him detained, according to this, for as long as he had suicidal tendencies. They had no discretion to remove him from the country and send him back to Mexico. Is that your point? Actually, I think that is perhaps not my point. If it's not your point, at what point does the Immigration Service have any discretion to say, this man should go back to Mexico? Well, I think that perhaps they could have consulted with the Mexican authorities and said, we have a person who is suicidal who is mentally ill. Well, they did give him over to the Mexican authorities and provided the hospital records, which showed that he had suicidal tendencies. So would that discharge whatever negligence duty there was? No, no. I think that would not have been reasonable. Get back to my point, which is they've realized Castillo has suicidal tendencies. The way you read this, and pardon me, the way I read this, is the staff has this obligation only as to detainees. They don't have this obligation as to people who have been removed. They only have to be detainees. Right. Now, does that mean that they can hold a Mexican citizen indefinitely while he has the part? They must hold him indefinitely while he has suicidal tendencies? Well, I don't know that that question is, you know, in this case. Certainly while he has suicidal tendencies, and they know that that's the case, they need further analysis. They need not to turn loose a person who has suicidal tendencies, and they know that. I suppose the doctor tells them he has suicidal tendencies, but not to be executed immediately. There's no immediate danger of suicide, but he does have suicidal tendencies. Is that a different case? Well. Because I think that's what Dr. Mosman said, right? Well, you know, in this case, there's, you know, a series of elements. One, of course, is that they specifically undertook the duty to keep him on suicidal watch. And Dr. Mosman specifically told them that, in fact, he told them that they should return him and keep him under suicide watch, and they undertook that, to do that. Your position is as long as there's a warning that this person has suicidal tendencies, the Immigration Service has no discretion to remove the person and send them back to Mexico, so long as that diagnosis of suicidal tendencies has not been changed. Well, I think. It could be years, right? Yeah. I think warning is a bit of a loaded question within the context of this case. This man, from the first to the last moment, asked for the Border Patrol to kill him. When he first was encountered, he got down on his knees and said, shoot me and get it over with. The last moment he said, why don't you just kill me now and get it over with. The same kind of thing. And then there were really three attempts in between and an attempt himself to kill himself. So I think putting warnings in, you know, I'd be interested in the facts of those cases. Tell me how long the Immigration Service was under a mandatory statutory or regulatory duty to hold this individual because Dr. Mosman has said, A, he's got suicidal tendencies, B, there's no immediate danger that he suicides. I believe they need to hold him until his suicidal tendencies, until they are aware that he's no longer suicidal. It could be years, right? Well, I suppose it could be. They have no discretionary power under the statute to remove this gentleman who snuck in to the United States. Back to Mexico. I think there are, you know, I believe there's an alternative available to them. One would be to consult with the Mexican government, let them know that this person is suicidal and needs. They did two things. They turned over the hospital records, which showed that he was suicidal tendencies, and they told the border person from the Mexican authority that he banged his head trying to kill himself. No, they did not. I thought I read it in the record. No. What they said was that this was a self-inflicted wound. Oh, all right. They didn't describe the wound. In other words, they were saying, hey, look, we didn't beat this guy up. He got this thing because he did it to himself. And they didn't say it was a 12-centimeter file thickness thing and he's tried to commit suicide. They didn't say that. Do you agree that they turned over the hospital records, which showed that he had suicidal tendencies? Excuse me? Do you agree that they turned over the hospital records that showed he had suicidal tendencies? No. There's actually a dispute in the evidence. The officer who was there watching and who said, you know, he was looking at my gun and what was he going to do next, he didn't see any documents being turned over. But what happens at the border, and I think this testimony is real clear, is they bring, and there's testimony, they bring vans up to the border. They back it up. They've got a lane for them. People get out. They walk across the border. The Mexican authorities don't say, who are you here? Why are you here? What are you carrying? And so there was a dispute as to whether or not he had some medical records from the hospital, but there was no indication that anyone at the border could read English, saw them, knew what was in it, knew the importance of it. The Mexican authorities really, in Nogales, when anybody enters that country, let alone there's no examination, and tens of thousands of people are brought there by INS, and they open the door and they walk into Mexico. Counsel, doesn't the fact that you acknowledge there were alternative courses of action indicate that this is a discretionary decision? No. I think that the question that I was responding to really was, like, given enough time, if the INS, you know, like the question was, do they have to hold him indefinitely? And my answer on indefinite is there are things that they reasonably can do over time to learn more about his condition, inform the Mexican government, find out what the alternatives are. I don't know about indefinite. What I know, and I think the case is, and this policy is pretty clear, is we're dealing with an acute situation with a person who has repeatedly tried to ask to be shot, tried to kill himself, and says, take me to Nogales and I'll kill myself, and they have him tied and bound and take him to the border and watch him walk away. They can't wash their hands of someone who they know is acutely mentally ill. That's the situation, and that's what this written policy says you can't do. And it's not a question of second-guessing something and going too far down the road into the future. The real problem is what they knew right then and everything that was available to them, it was contrary to a written policy, and they didn't have a discretion to say, hey, we don't have a padded cell, let's just drive this guy straight to the border, and isn't it funny? He says, get it over with and kill me. Thank you, counsel. Your time has expired. We'll hear from the government. Thank you, and may it please the Court. I'm Charles Davis on behalf of the appellee of the United States. In this matter, the district court following a review of the specific facts of this case in a rather extensive record correctly concluded that it lacked jurisdiction under the Federal Tort Claims Act. How and under what circumstances a potentially mentally ill detainee such as Mr. Panaccio, who was illegally present in this country, is released and returned to his country of origin, falls within the discretionary function of the FTCA. And I'd like to emphasize that despite the plaintiff's characterization, we are dealing with and Border Patrol was dealing with a potentially mentally ill detainee. At no time was Mr. Panaccio ever clinically diagnosed as suicidal. The record is clear that suicidal ideation is not a diagnosis. The testimony of Dr. Scott Mosman is unambiguous in that regard. At no time was Dr. Mosman evaluated Mr. Panaccio following his hospitalization for a self-inflicted injury. At no time was Dr. Mosman aware that Mr. Panaccio was in an imminent risk that he would hurt himself or others. If he had thought that, he would have insisted that Mr. Panaccio be admitted to the hospital. Nobody at the Border Patrol put any pressure on the hospital to release Mr. Panaccio. They said that they would abide by whatever decision the hospital made in that regard. Dr. Mosman did not know what the final disposition of Mr. Panaccio's situation would be. He did not know what jail Mr. Panaccio would be taken to, what the facilities were like at that jail, how long he would be in jail, and he didn't give any specifics as to how Mr. Panaccio needed to be evaluated. Again, if he thought that there was an imminent risk that Mr. Panaccio would hurt himself after he had been discharged, then he would have instructed the Border Patrol to return Mr. Panaccio to the hospital. There are simply no specific mandatory statutes, rules, or regulations that prescribe the course of action for the Border Patrol's return of Mr. Panaccio. The statute, the INS policy upon which plaintiffs rely, does not provide whether and under what circumstances a detainee may be released. The policy does not have any specific language as to whether or not a detainee is allowed to continue the release and return. The policy does not remove the discretion from the Border Patrol as to what to do with a person in Mr. Panaccio's situation. It provides that a detainee, the INS in this case, would act with appropriate sensitivity. And as we have seen in the Wysich case and others, that does not remove discretion from the officials. In any event, the policy wasn't violated. Mr. Panaccio was not diagnosed as clinically suicidal. The Border Patrol's conduct in returning Mr. Panaccio was at a minimum susceptible to the weighing of policy analysis related to manpower, logistical issues, treatment costs, available facilities, and the United States relationship with Mexico. The fact that there's an agreement between the United States and Mexico related to the procedure for the return of Mexican nationals with particular special needs further bolsters the conclusion that the Border Patrol's conduct in this instance was susceptible to policy analysis. The plaintiff's arguments in large part focus on what could have happened, what the Border Patrol could have done. And these arguments are off point for two reasons. First of all, negligence is irrelevant to the discretionary function analysis. And secondly, the fact that the Border Patrol had options tends to indicate that there was some negligence in the process. So the question is, what would it do, and how it would handle a person in Mr. Panaccio's situation? Kennedy. Would you address the second ground that the judge used to dismiss this case, which was the lack of proximate cause under Arizona law? Martinez. Yes, Your Honor. The judge, the district court, correctly concluded that it lacked jurisdiction in this case. However, then it went on to discuss the alternative basis asserted in the motion for summary judgment. The alternative bases, rather, one of which related to the lack of proximate cause under Arizona law. It's our position that the district court correctly concluded that without engaging in inappropriate speculation, one couldn't connect the Border Patrol's alleged failure to provide additional information to the Mexican officials upon Mr. Panaccio's return to the subsequent action of Mr. Panaccio's alleged suicide by cop. While proximate cause is generally an issue for the jury, under Arizona law, they've described the court's role as that of a gatekeeper. And the court can, following a review of the facts, determine that the court has concluded that you just can't connect A to Z without inappropriate speculation. And that's what the court did here. The testimony of plaintiff's own expert said he was unable to conclude that had the Mexican officials been provided additional information regarding Mr. Panaccio's condition, that that would have avoided that result. So in the court's reasoning, which it's our position, it can be a How can an expert witness utter an opinion as to an issue of fact? The expert, in this case, offered several opinions about what occurred, what should have occurred, and the consequences of the actions that didn't occur. The expert, in this case, talked about Mr. Panaccio's mental condition and the fact that he was insistent on taking his own life and various other factual-based issues. Was there any objection to the expert giving this testimony? The expert testimony that I specifically referred to went in without objection. Thank you. And with respect to the State law issues, Your Honor, this decision of the trial court can be upheld on any basis supported by the record. And the United States submits there simply isn't any evidence of a breach of any duty owed to Mr. Panaccio. Mr. Panaccio injured himself while in detention. He was taken to the hospital. His needs were addressed in the hospital. There's no dispute that he received appropriate treatment by the Border Patrol in taking him to the hospital. At no time was he diagnosed as clinically suicidal. There's no evidence that the Border Patrol breached any duty that it would have owed to Mr. Panaccio. But anyway, we don't get to that issue if we agree with your view with respect to the Federal Tort Claims Act. Correct. That would be a basis for concluding that the Court lacks jurisdiction. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Rawlinson, Bea